(86 Misc. Rep. 553)

### CARPENTER et al. v. HEINZE et al.

(Supreme Court, Special Term, New York County. July, 1914.)

CORPORATIONS (§ 123*)—PLEDGE OF STOCK—FORECLOSURE—SUFFICIENCY OF EVIDENCE.

    Evidence in an action to foreclose a lien on corporate stock deposited with plaintiffs to assure performance of an agreement growing out of transactions in the buying and selling of corporate stock *held* to authorize a judgment dismissing defendant's counterclaim and awarding plaintiffs the amount demanded in their complaint, subject to certain deductions concerning which the contracting parties had agreed.

    [Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 481, 491, 507–512, 537, 539–546, 569, 618; Dec. Dig. § 123.*]

Action by Nathaniel Leslie Carpenter and others against Frederick Augustus Heinze and another. Judgment for plaintiffs.

Blandy, Mooney & Shipman, of New York City (Edmund L. Mooney, of New York City, of counsel), for plaintiffs.

Stanchfield & Levy, of New York City (Max D. Steuer, of New York City, of counsel), for defendants.

FORD, J. This suit is to foreclose a lien upon 15,000 shares of Ohio Copper Mining Company stock deposited with plaintiffs to assure performance of a certain agreement dated April 17, 1909, made between plaintiffs and defendants. That agreement grew out of transactions in the buying and selling of stock of the former Ohio Copper Company and also the stock of at least two other corporations.

The plaintiffs are stockbrokers. Of that firm Mr. Baggot was the one who had personal charge of the transactions in question. His

original customer was one Lamar. Certain sales and purchases were made by plaintiffs on behalf of Lamar down to March 13, 1909. The defendant Warfield then came into the account. He was vice president of the Ohio Copper Company, of which the defendant Heinze was president. Afterwards Lamar dropped out of the account, and the defendant Heinze assumed his responsibility in that regard. "Trading," was for a time very active upon the "curb," and during that time many thousands of shares of "Ohio" changed hands. The plaintiffs admit that they were the brokers through whom the extraordinary volume of trading in "Ohio" was effected. There is no doubt that a "campaign" in "Ohio Copper" was skillfully inaugurated and adroitly conducted, but there is dearth of proof that plaintiffs were cognizant of its details. At the end of the "campaign" both plaintiffs and defendants found themselves in trouble. The plaintiffs held 60,800 shares of "Ohio," and the defendant Heinze, who concededly was "behind Ohio," found himself in danger of having that large block of stock unloaded on the market.

The testimony is not entirely clear as to which side made the first overtures for peace, but the fact is that they did come together and executed the agreement of April 17, 1909. By the terms of that agreement the defendants agreed to take over the 60,800 shares of "Ohio" held by plaintiffs at an agreed price, in blocks for future delivery, the whole delivery stretching over several months. In addition the defendants agreed to "clean up and settle the account now standing on the books of Carpenter, Baggot & Co. in the name of Carlos Warfield and David Lamar, the said account, subject to adjustment at that time, being hereby assumed by F. Augustus Heinze and Carlos Warfield." The defendants deposited 15,000 shares of Ohio Copper Company stock to secure performance of their part of the contract. Later the stock of the newly organized Ohio Copper Mining Company in the same amount was substituted with the same force and effect as the original deposit. The defendant Heinze took over and paid for, at the agreed price, the 60,800 shares of "Ohio," and then took up the matter of adjusting the brokerage account on the books of Carpenter, Baggot & Co.

The immediate cause of this controversy is the refusal of the defendants to pay the balance shown against them on the books of the plaintiffs. Their refusal is based upon several grounds. Not only do they refuse to pay the balance, but they set up a separate defense founded upon duress and a counterclaim based upon false representations. As to the alleged duress and false representations I have little difficulty. Essential elements are obviously lacking in defendants' case upon both grounds. These having been thus eliminated, we return to the discussion of the account.

Defendant Heinze contends: (1) That the plaintiffs have failed to prove any part of their affirmative case; (2) that the defendants' alleged assumption of the account is null and void, because there was no account to be assumed. As to these contentions, the whole series of events leading up to the commencement of this action, and the books, letters, records, and other papers and documents introduced

in evidence and used upon the trial, and particularly the contract of April 17, 1909, between plaintiffs and defendants, show that there was a real account, and the only privilege remaining to the defendants was to go over it with a "fine tooth comb" and dispute any and every item in it which was not bona fide. That the defendants have done with this result.

I am of opinion that the commissions claimed by the plaintiffs should be reduced by the amounts of commissions charged on the failed trades, including the 35,800 of March 18th and 19th, the 35,000 shares originally sold to defendant Heinze, the 8,800 shares of March 22d, or thereabouts, and the final 60,800 shares, which the defendant Heinze took over and paid for pursuant to the contract of April 17, 1909. By consent the revenue disbursement on these failed trades is also to be deducted.

The trades on behalf of the plaintiff Atmore L. Baggot individually have given me no little trouble. I have not disregarded the strict accountability to which a broker is held in dealing with his customer's stock; but Mr. Baggot, who had personal charge of the Lamar, Lamar and Warfield, and Heinze and Warfield account from the beginning to the end, took the witness chair, subjected himself to examination and cross-examination, and testified, in effect, that what he did in respect of his trades in "Ohio" was with the knowledge and consent, and even at the solicitation, of his customer Lamar. The way in which the account was conducted naturally gives rise to a strong suspicion as to its bona fides. Nevertheless, Mr. Baggot from the witness chair gave a version of the transactions quite reconcilable with all the other evidence in the case.

On the other hand, defendants called no witness who had personal knowledge of the transactions which culminated in the account. It seems that Lamar was within reach, at least for the purpose of taking his deposition. The broker Rothenberger was concededly in the city, and he surely could have thrown a strong ray of light upon some obscure phases of this case. No explanation was made by the defendants for their failure to produce these witnesses upon the trial, both of whom had intimate personal knowledge of the transactions. Nor did the defendants call the defendant Warfield, who, represented by counsel, appeared and actively defended. So, in my view, the weight of evidence is on the side of the plaintiffs, and I conclude that the trading of Mr. Baggot in "Ohio" was no breach of any duty he owed his customer, and the $2,000 profit he made in the trades are lawfully and rightfully his.

The double commissions on the Borg and Weil cancellations ($634.-75) should be deducted.

The counterclaim will be dismissed, and judgment will be given in favor of plaintiffs as demanded in the complaint, subject to the deductions indicated in this memorandum and as agreed upon the oral argument.

Judgment accordingly.